[Crim. No. 12805. In Bank. Feb. 28, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. PATRICK
IRELAND, Defendant and Appellant.

Sheela, Lightner, Hughes, Hilmen & Castro, Sheela, O'Laughlin, Hughes & Castro and Peter J. Hughes for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Thomas Kallay and Philip C. Griffin, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant Patrick Ireland was charged by indictment with the murder of Ann Lucille Ireland, his wife. He entered pleas of not guilty and not guilty by reason of insanity and, after a trial by jury, was found guilty of murder in the second degree. Defendant's plea of not guilty by reason of insanity was personally withdrawn by him, and he was sentenced to imprisonment for the term prescribed by law. He appeals from the judgment.

Defendant, a high school teacher, and Ann Lucille Ireland, the deceased, were married in 1957 while defendant was attending college. They had two children, born in 1958 and 1960, respectively. In 1963 they began to experience marital difficulties and Ann entered into the first of a series of secret

extramarital affairs. Defendant soon began to doubt his wife's fidelity and to make accusations against her. Ann at first denied her involvement, and defendant's accusations resulted in a number of violent physical encounters between them in which Ann sustained injuries. The relationship continued in this turbulent and unhappy state for several years.

Early in 1967, Ann consulted an attorney and commenced an action for divorce. The parties continued to live together, however, and undertook several attempts to revive their marriage. Their efforts were unsuccessful, and Ann soon became involved in an extramarital relationship with the salesman for a company which had installed a swimming pool at the Ireland residence. Defendant was informed of this by a family friend, and when he accused Ann she admitted her involvement and shortly thereafter promised to sever the relationship in the interest of the family. Defendant, in order to make certain that Ann would keep her promise, hired a private detective to follow her. Apparently Ann's relationship with the salesman was terminated by the latter when he learned of the private detective, but this did not result in improved relations between the Irelands.

During this period defendant began to suffer from headaches, nervousness, and fatigue, and consulted a doctor who prescribed medication for these conditions.

On April 24, 1967, the Irelands met with a conciliation counsellor attached to the county conciliation court. As a result of this meeting defendant and Ann agreed to seek the services of the Western Behavioral Institute in a last effort to save their marriage; apparently Ann's consent to this step was obtained with some reluctance on her part.[1] After the meeting defendant suggested that they have lunch together but Ann was not willing to do so and they returned to their home. Ann went out to her hairdresser that afternoon, and when she had returned and the children had been put to bed the Irelands discussed their meeting with the conciliation counsellor and their future appointment at the Western

[1] Apparently Ann's reluctance on this point resulted from a conviction in her own mind that no reconciliation would be effected. The prosecution produced evidence that, on April 18, without defendant's knowledge, she again consulted an attorney about obtaining a divorce, and that she had another appointment with him on April 27, two days after her death. It was also shown that Ann had made arrangements with a woman friend to rent an apartment together; that the two went apartment hunting on April 12 and again on April 25, the day of the murder; and that they had decided to rent the apartment in the friend's name, with the understanding that Ann was to pay the rent.

Behavioral Institute. Defendant agreed to undertake certain changes in their relationship such as diminishing the influence of his parents, who lived nearby, and allowing Ann to assume a more positive role in the family. Ann again expressed to defendant a willingness to make efforts in the interest of renewed family harmony.

On the morning of April 25, Ann displayed a sullen and incommunicative attitude in response to defendant's attempts to engage in conversation with her. Defendant made efforts to be relieved from his teaching duties but was unsuccessful in doing so and taught five classes during the day. When he returned home between 3:30 and 4 p.m., Ann was not at home, but shortly thereafter she returned from the market where she had been shopping. During the day defendant had taken the various medications which had been prescribed for him, and prior to Ann's return from the market he drank two coffee mugs of wine. Upon her return defendant, Ann and their daughter went out to purchase chlorine for their pool and to do other errands, and on their way home defendant suggested that they have dinner at the home of a friend. Ann did not wish to do so, and they returned home where she prepared dinner for the family. Defendant at this time had another coffee mug of wine and took a rest until he was called for dinner. After dinner defendant lay down again and had another coffee mug of wine.[2]

Sometime between 7:30 and 8:30 p.m. on April 25, 1967, defendant shot and killed his wife Ann by firing into her at close range two .38 caliber bullets from a pistol which he usually kept in his bedroom. Defendant himself testified that he had no memory of the actual shooting or of certain events occurring thereafter, and the only known details of the homicide were provided at trial by the testimony[3] of his six-year-old daughter, Terry, in whose presence the shooting took place.

Terry testified that after she had gone to bed on the evening in question she heard her parents talking in the den where her mother had been watching television; that she asked her parents what they were talking about and they replied that they were talking about the television program; that her parents

---

[2]The foregoing background facts are not disputed and are drawn primarily from defendant's testimony at trial.

[3]Terry was not actually called as a witness at trial. By stipulation of the parties a statement given by her to police officers on the night of the crime was admitted in lieu of actual testimony.

were really "talking about who was going to leave first"; that defendant shortly thereafter "got the gun in his pocket," returned to the den, and asked Ann to go outside by the swimming pool and talk; that Ann refused to go and defendant pulled her off the couch where she was lying; that Ann fell to the floor, and she, Terry, then went into the room and began crying; that defendant then sat down in a chair and Ann climbed back upon the couch; that defendant then took the gun from his pocket, and said "Now what, Ann?" and fired three shots at Ann; that the first shot went into the window and the second and third shots struck Ann in the eye and chest; that defendant then went into the front room and "was sitting and rocking and crying"; and that she, Terry, then stayed on the couch with her mother, Ann, until neighbors arrived.

■ Defendant's first contention relates to certain testimony introduced by the prosecution in rebuttal. After defendant had taken the stand in his own defense and had related the background material set forth above (text preceding fn. 2, *ante*)—and had in the course of his testimony detailed an incident several years before the homicide in which Ann had attacked defendant with a knife in the course of an argument—the prosecution called as a witness Mrs. Janice Blount, a family friend who had known defendant for some 11 years. Mrs. Blount first testified that early in April defendant had visited her and they had discussed Ann's infidelity. Then the prosecution sought to elicit from Mrs. Blount the substance of a telephone conversation which she had had with Ann on the morning of April 25. An objection was interposed on the ground of hearsay and argument ensued out of the presence of the jury. The prosecutor offered to prove through the testimony of Mrs. Blount that Ann had stated to her on the telephone: "I know he's going to kill me. I wish he would hurry up and get it over with. He'll never let me leave."

The prosecutor argued that this statement was admissible to show Ann's state of mind immediately prior to her death. Such state of mind was relevant, he urged, "to show the probabilities of the decedent's conduct . . . that she would not have done anything to provoke him." The defense took the position that Ann's state of mind was not relevant to any issue in the case because the proposed evidence "doesn't tend to rebut anything that was put in [because] all Ireland testified to was that he was getting the silent treatment, not that there was any aggressive conduct on her part." The court

overruled the objection in the following language: "Well, as I understand it, it rebuts several things—Oh, I am not going to argue the matter. I think it's admissible." Mrs. Blount then proceeded to testify before the jury in accordance with the offer of proof.

It is clear that the evidence here in question is hearsay evidence within the meaning of section 1200, subdivision (a), of the Evidence Code, which we set forth in the footnote.[4] The only purpose for its admission was to show that the matters therein stated were true. The physical fact that the words in question were spoken by Ann had no possible bearing upon the issues in the case except insofar as that fact tended to prove the truth of the matters asserted in those words. (Cf. *Smith* v. *Whittier* (1892) 95 Cal. 279, 293-294 [30 P. 529]; see generally Witkin, Cal. Evidence (2d ed. 1966), §§ 463-471, pp. 425-433.)

It is urged that the statement in question was nevertheless admissible to show Ann's existing mental or physical state under the exception to the hearsay rule stated in section 1250, subdivision (a), of the Evidence Code, which we also set forth in the footnote.[5] As the italicized portion of that subdivision demonstrates, however, the exception is applicable only when the declarant's state of mind (1) is itself an issue in the case, or (2) is relevant to prove or explain acts or conduct of the declarant.

It is clear at the outset that the declarant Ann's state of mind on the day of her death was not *itself* an issue in the case (cf. *People* v. *One 1948 Chevrolet Convertible Coupe* (1955) 45 Cal.2d 613, 620-622 [290 P.2d 538, 55 A.L.R.2d 1272]; *Adkins* v. *Brett* (1920) 184 Cal. 252, 255-256 [193 P. 251]) and that the hearsay statement was therefore not admissible under subdivision (a)(1) of section 1250. The People's reliance on *People* v. *Brust* (1957) 47 Cal.2d 776 [306

---

[4]Evidence Code section 1200, subdivision (a) provides: " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."

[5]Evidence Code section 1250, subdivision (a) provides: "Subject to section 1252 [forbidding the admission of a statement 'made under circumstances such as to indicate its lack of trustworthiness'], evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: (1) The evidence is offered to prove the declarant's state of mind, emotion or physical sensation at that time or at any other time *when it is itself an issue in the action*; or (2) the evidence is offered to prove or explain acts or conduct *of the declarant*." (Italics added.)

P.2d 480], in this regard is wholly misplaced. There the *defense* sought to introduce two statements made by the victim some months before the homicide, and one statement made the afternoon before the homicide, in order to support its theory "that a long-continued provocatory course of conduct of Mrs. Brust culminated in bringing defendant to a point where his capacity for cool deliberation was substantially impaired." We there held that the first two of these statements, which manifested the victim's hostility toward defendant, were admissible as nonhearsay circumstantial evidence of the victim's hostility, which "tend[ed] to show the probability of hostile conduct toward defendant." The third statement was held admissible under the state-of-mind exception to the hearsay rule as "a declaration of the victim's intent to behave provocatively toward defendant" on the day of the homicide. (47 Cal.2d at pp. 784-785.) It is thus clear that the evidence in *Brust* insofar as it was hearsay was deemed admissible not because the declarant's state of mind was "itself an issue in the action" but because such statements tended "to prove or explain acts or conduct of the declarant."[6]

Thus, the only tenable theory of admissibility was that the statement, in the terms of subdivision (a)(2), was "offered to prove or explain acts or conduct of the declarant." The People, urging the applicability of this subdivision, contend that the statement in question "tended to rebut the inference raised by appellant's testimony that the deceased may have been the aggressor." Reference is here made to defendant's testimony that Ann, in the course of an argument which occurred some four years prior to the homicide, attacked defendant with a knife.

The difficulty with this position is that the defense *did not raise any issue of fact* with respect to Ann's conduct immediately preceding her death. The undisputed prosecution evi-

---

[6]Some pre-Evidence Code cases of this court involving the admission of state-of-mind hearsay declarations on the part of the victim have used language suggesting that even when such statements are admitted to explain the victim-declarant's subsequent conduct the basis of admissibility is the fact that such state of mind is "in issue." (See, for example, *People* v. *Hamilton* (1961) 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473]; *People* v. *Lew* (1968) 68 Cal.2d 774, 779 [69 Cal. Rptr. 102, 441 P.2d 942].) We believe that the enactment of the Evidence Code now requires a more careful use of language in the premises in order that the statutory distinction reflected in subdivisions (a)(1) and (a)(2) may be preserved. (See generally Chadbourn, A Study Relating to the Hearsay Evidence Article of the Uniform Rules of Evidence, 6 Cal. Law Revision Com. Rep. (1964) pp. 505-514.)

dence given by the Ireland's daughter Terry established that Ann was reclining on a couch when she was shot by defendant. The defense did not dispute this fact but rather rested its entire case upon a contention that defendant's mental state at the time of his act—as affected by cumulative emotional pressure and the ingestion of alcohol and prescribed medications was not that required for murder. The testimony which the People urge places Ann's conduct in issue—that showing that some years before the homicide Ann had attacked defendant with a knife—simply cannot be construed, in light of all the evidence in the case, to raise an issue as to Ann's conduct on the night of the homicide.

The case of *People* v. *Lew* (1968) 68 Cal.2d 774 [69 Cal. Rptr. 102, 441 P.2d 942], although it was tried before the effective date of the Evidence Code, is nevertheless instructive on the point here in question.[7] There defendant maintained that the death of the victim resulted from an accident which occurred when she was examining defendant's gun while seated on his lap in a chair. Certain hearsay and double hearsay statements showing the victim's fear of defendant were admitted under the state-of-mind exception. On appeal from the judgment of second degree murder we concluded that the statments were "relevant to an issue of fact raised by the defense" (68 Cal.2d at p. 780) even though the case involved neither a claim of self-defense (see *People* v. *Atchley* (1959) 53 Cal.2d 160, 172 [346 P.2d 764]) nor an issue as to whether the victim had voluntarily been with defendant on the night in question (see *People* v. *Alcalde* (1944) 24 Cal.2d 177, 185 [148 P.2d 627] ; cf. *People* v. *Finch* (1963) 213 Cal.App.2d 752, 765 [29 Cal.Rptr. 420]). The "issue of fact raised by the defense" to which the statements were relevant was simply that of whether the death had been accidental as claimed by defendant. The jury might reasonably have inferred from such statements that, contrary to defendant's account, the victim would not have sat in the lap of defendant and examined his firearm—especially in light of other evidence in the case to the effect that the victim feared guns. (68 Cal.2d at pp. 779-780.) In spite of this conclusion, however, we went on to hold that the statements should have been excluded because

[7]We stated in *Lew* that "Section 1250, which sets forth the state-of-mind exception, is in all essential respects a codification of the common law then [i.e., at the time of enactment] existing in this jurisdiction." (68 Cal.2d at p. 781, fn. 3.) We thus consider *Lew*, which represents a statement of the common law existing prior to the effective date of the code, a reliable guide to the interpretation of section 1250.

most of them made specific reference to past conduct of the defendant and a number of them were made in circumstances which cast doubt upon the declarant-victim's credibility. (See *People* v. *Hamilton* (1961) 55 Cal.2d 881, 893-896 [13 Cal. Rptr. 649, 362 P.2d 473]; cf. Evid. Code, § 1252, and Law Revision Commission Comment appended thereto.)

In the instant case, unlike in *Lew*, the "acts or conduct of the declarant" (Evid. Code, § 1250, subd. (a)(2)) at the time of the homicide were simply not in dispute; the defense did not deny that such "acts or conduct" were precisely as described by the Ireland's daughter Terry. (Cf. *People* v. *Purvis* (1961) 56 Cal.2d 93, 98 [13 Cal.Rptr. 801, 362 P.2d 713].) In such circumstances it must be concluded that the hearsay statement of Ann offered through the testimony of Mrs. Blount was improperly admitted into evidence.[8]

Our conclusion renders unnecessary an inquiry as to whether the statement in question was inadmissible because it was "made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252; see fn. 5, *ante*.)

The error was prejudicial. The statement in question not only reflected Ann's state of mind at the time of utterance; it also constituted an opinion on her part as to conduct which defendant would undertake at a future time. On the basis of this hearsay opinion the jury might reasonably have inferred that Ann several hours before the homicide had concluded that defendant had then formed the intention to kill her. The next logical inference, to wit, that Ann's assessment of defendant's then intention was accurate and defendant had in fact formed an intention to kill several hours before the homicide (see fn. 8, *ante*), strikes directly at the heart of the defense. The judgment must, therefore, be reversed. (Cal. Const., art. VI, § 13.)

Two of defendant's other contentions warrant our present attention for the guidance of the court upon retrial.

Defendant claims that certain extrajudicial statements introduced against him were obtained in violation of his constitutional rights. After defendant was arrested and handcuffed at his home he was escorted by two officers to a waiting police car. On the way to the car he was advised of

---

[8]The fact that Ann's state of mind might, through a series of inferences, be considered probative of defendant's intentions at the time of utterance cannot render her hearsay statement admissible under the state-of-mind exception. Section 1250, subdivision (b), expressly provides: "This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

his rights in accordance with *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and, upon being asked whether he had anything to say at that time, he replied: "Call my parents for my attorney." Apparently neither of the officers responded to defendant's request, took any action as a result of it, or attempted to communicate it to superior officers.

Defendant was placed in the car and transported to the police station. At two points during the trip he asked some questions about his wife and his children, and the officer driving said to him: "Sir, I'm not allowed to talk to you at all concerning this case, and they will talk to you later at the station." This response on the part of the officer was in accordance with orders given to him by a police sergeant at the Ireland home.[9]

When defendant arrived at the police station he was immediately placed in an interrogation room where the handcuffs were removed and he was searched. Then, upon being instructed to do so, he sat in a special chair provided for the interrogation of suspects[10] and waited while the officer who had driven him to the station undertook an inventory of the property found on his person. In response to questions by the officer as to the nature of particular items of such property defendant made certain discursive remarks concerning the disintegration of his family.

Approximately five minutes after defendant's arrival at the interrogation room a police lieutenant (the watch commander) entered and, observing the officer taking an inventory of defendant's property, asked defendant if he had been advised of his rights. Defendant replied in the affirmative but the lieutenant nevertheless proceeded to give such advice "to see that he had been fully admonished." Defendant indicated that he understood and asked if the lieutenant wanted to talk to him. The lieutenant said that he did not, but that "there was an officer coming down that would talk to him." The officer referred to was Sergeant Cartwright, the chief of detectives.

Approximately 35 minutes after defendant's arrival at the

---

[9]It does not appear that the sergeant who gave this order heard defendant's request for an attorney or was informed of it. Apparently the order was simply representative of police practice.

[10]The officer testified: "We have a large chrome-pipe chair with a padded seat cushion and padded back on it, and it's bolted to the floor, and that's the only chair that remains in the room other than when we bring a chair in, and at this time it was the only chair in the room."

interrogation room—after the inventory had been completed, booking information obtained, and a photograph taken—Sergeant Cartwright arrived. He asked the officer who had conducted the booking to leave and, when he had done so, advised defendant of his *Miranda* rights for the third time. After defendant had again indicated that he understood the admonition, Sergeant Cartwright, who had not been informed of defendant's request for an attorney, asked defendant "if he was willing to talk with me, and he said that he wanted to talk with someone and was I willing to listen to what he had to say." Sergeant Cartwright replied that he would be willing to listen and the two men then engaged in a conversation which, after the detective had told defendant that his wife was dead, resulted in a confession wherein defendant, in response to questions, indicated that he had shot his wife; that he had used a .38 caliber pistol to do so; that marital problems were the basis of the shooting; and that his wife had been seeing another man, whom defendant refused to name. At the conclusion of this conversation, which lasted from 30 to 45 minutes, defendant again asked to speak with his parents on the telephone.

Defendant was then taken to the office of the chief of police and his parents were contacted on a telephone there. Defendant spoke to his father and said that he had killed Ann. He then began to sob and Sergeant Cartwright took the telephone from him and told the father that he should come to the police station as soon as possible. The sergeant then undertook a second conversation with defendant which was recorded without his knowledge and which lasted approximately a half hour until defendant's parents arrived at the station. In this conversation defendant, in spite of the sergeant's efforts to elicit the details of the shooting, engaged in a rambling monologue concerning the purchase of his house and the shopping trip that he had taken with Ann and his daughter earlier in the evening.

When defendant's parents arrived they almost immediately asked him if he wanted a lawyer. Apparently defendant made no response to this question, but one of the three other persons present (Sergeant Cartwright, defendant's father, defendant's mother) said "Yes, I think he should have a lawyer."

At trial defendant's first (unrecorded) conversation with Sergeant Cartwright was sought to be introduced through the testimony of the latter. Following *voir dire* examination of

the officer, objection was made by defendant "on the grounds it was conducted after a request to contact his parents for an attorney was made, which request wasn't honored." The objection was overruled on the ground that defendant had elected to participate in the first conversation and there was no "constant or . . . consistent pattern on the part of the defendant to refuse to discuss . . . the matter in the absence of counsel. . . ." Sergeant Cartwright then proceeded to relate before the jury the substance of the first conversation.

The second (recorded) conversation was placed in evidnce over defendant's continuing objection through the testimony of Sergeant Cartwright and through the playing before the jury of the tape recording.

In the recent case of *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], we emphasized that "A principal objective of [the *Miranda*] decision was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions." (68 Cal.2d at p. 717.) We then went on to indicate that this objective imposed upon us a constitutional responsibility to insure that extrajudicial statements of criminal defendants not be admitted at trial unless the full range of "protective devices"[11] prescribed by *Miranda* was in operation at the time when such statements were obtained.

One of the primary "protective devices" envisioned by *Miranda* is that requiring that custodial interrogation wholly cease when the suspect indicates in any manner that he wishes to exercise his Fifth Amendment privilege. A suspect may indicate such a wish in many ways. He may, as in *Fioritto,* refuse to sign a waiver of his constitutional rights; he may simply refuse to continue an interrogation already in progress; or he may, as in the instant case, ask for an attorney. "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is*

[11]"Unless adequate *protective devices* are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." (Italics added.) (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 458 [16 L.Ed.2d 694, 714].)

**536**

*present."* (Italics added.) (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 474 [16 L.Ed.2d 694 723].)

■ We think it clear the defendant's statement in the police car ("Call my parents for my attorney") constituted a request on his part that his attorney be summoned. Further, we do not think that the *Miranda* decision permits speculation on our part as to whether the defendant wished to see his attorney prior to interrogation or merely wished to consult with his attorney at some unspecified future time. Clearly defendant's request manifests a desire to have the assistance of his attorney at the earliest possible moment. This, under *Miranda,* is an assertion of the Fifth Amendment privilege—and therefore "the interrogation must cease until an attorney is present." (384 U.S. at p. 474 [16 L.Ed.2d at p. 723].)

The People contend, however, that the statements uttered by defendant subsequent to his assertion of the privilege were nevertheless admissible because they were volunteered statements given under circumstances which clearly manifest an intention to waive the privilege previously asserted. Great emphasis is placed upon defendant's conduct subsequent to his request for an attorney and his continuing efforts to find a policeman who would listen to him.

The principle to which the People turn for comfort was stated in *Miranda* as follows: "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but *whether he can be interrogated.* There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime [footnote citing *People* v. *Dorado* (1965) 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361]], or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (384 U.S. at p. 478 [16 L.Ed.2d at p. 726].)

Not only did we affirm our adherence to this principle in the *Fioritto* case, but we also there indicated that even a defendant in *custody* might make statements admissible under *Miranda* if it were shown that such statements were the result of the defendant's own initiative and did not arise in a context of custodial *interrogation.* (68 Cal.2d at pp. 718-720; see *People* v. *Lara* (1967) 67 Cal.2d 365, 392 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Tomita* (1968) 260 Cal.App.2d 88,

92 [66 Cal.Rptr. 739].) ██ However, as we also suggested in *Fioritto,* the teaching of *Miranda* does not permit us to characterize as "voluntary" or "spontaneous" any statements specifically obtained through custodial interrogative processes undertaken subsequent to a defendant's assertion of the privilege, for those are the very processes which *must cease* at that moment. As we indicated in *Fioritto* and have reiterated above, the *cessation* of custodial interrogative processes upon assertion of the privilege is one of the "protective devices" which must be employed "to dispel the compulsion inherent in custodial surroundings" (384 U.S. at p. 458 [16 L.Ed.2d at p. 714]), and any statement obtained without the use of that device is not admissible.

██ In the instant case defendant's assertion of the privilege, which under *Miranda* should have operated to shut down the machinery of custodial interrogation, had absolutely no effect upon the continued functioning of that machinery.[12] Immediately upon defendant's arrival at the police station he was placed in the interrogation room and in the special chair provided for the questioning of suspects. During the time he remained there his inquiries as to the giving of the statement were rebuffed with answers to the effect that that would have to await the arrival of the chief of detectives (or "the interrogating officer," as he was referred to by the Attorney General during oral argument). Approximately a half hour after defendant was placed in the interrogation room, this officer, Sergeant Cartwright, entered the room, dismissed the booking officer, and commenced the interrogation with a *Miranda* warning and an inquiry as to defendant's willingness to talk. We cannot conclude that statements thereafter made by defendant in response to direct questions by Sergeant Cartwright were not obtained in a custodial interrogative process initiated by police after defendant had asserted his Fifth Amendment privilege and, under *Miranda,* was entitled to be free from such a process. As we said in *Fioritto,* "The form of the renewed queries, however subtle or gentle, cannot be considered in determining whether there has been a violation of the stern principles prescribed by the Supreme Court in *Miranda.*" (68 Cal.2d at p. 720.) We conclude that all evidence of defendant's extrajudicial statements was erroneously admitted.

---

[12] The fact that a failure of communication within the police department might have been at fault can have no effect upon our decision. Our concern lies with the fact that, for whatever reason, custodial interrogative processes *did not cease* upon assertion of the privilege.

538

■ Defendant also contends that it was error, in the circumstances of this case, to instruct the jury on second degree felony murder. In the alternative he contends that, if second degree felony murder instructions were appropriate in this case, the court should have given an instruction requested by him which purported to cure any confusion which might result from the giving of such instructions. Because we agree with the former of these contentions we need not address ourselves to the latter.

■ The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of *all* felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought *and* to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated in section 189 of the Penal Code. (See *People* v. *Phillips* (1966) 64 Cal.2d 574, 582-585 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Williams* (1965) 63 Cal.2d 452, 457-458 [47 Cal.Rptr. 7, 406 P.2d 647]; *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Coefield* (1951) 37 Cal.2d 865, 868-869 [236 P.2d 570]; *People* v. *Valentine* (1946) 28 Cal.2d 121, 135-136 [169 P.2d 1]; See generally 1 Witkin, Cal. Crimes (1963) §§ 311, 325, pp. 283-284, 295-296.) ■ Thus, ''A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder.'' (*People* v. *Ford, supra,* 60 Cal.2d 772, 795.) ■ Accordingly, the giving of a second degree felony-murder instruction in a murder prosecution has the effect of ''reliev[ing] the jury of the necessity of finding one of the elements of the crime of murder'' (*People* v. *Phillips, supra,* 64 Cal.2d 574, 584). to wit, malice aforethought.

■ The jury in this case was given an instruction based upon CALJIC No. 305 (Revised). The instruction given provided in relevant part: ''. . . the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases: . . . Three, when the killing is a direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, such as an assault with a deadly weapon.'' The court then went on to instruct upon the elements of the crime of assault with a deadly weapon in the terms of CALJIC No. 604.

This instruction might have been understood by the jury in either of two ways. First, the jury might have concluded therefrom that it should find defendant guilty of second degree murder if it *first* found that defendant harbored malice aforethought and *then* found that the homicide had occurred in the perpetration of the crime of assault with a deadly weapon. If the jury had understood the instruction in this way it would have misconceived the doctrine of second degree felony murder as we have explained it above. Second, if the jury derived from the instruction the correct meaning of the doctrine in question, it would have concluded that it should find defendant guilty of second degree murder if it found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon. This, the proper understanding of the instruction (see *People* v. *Phillips, supra,* 64 Cal.2d 574, 584, fn. 9), would have relieved the jury from a specific finding of malice aforethought.[13]

We have concluded that the utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule "beyond any rational function that it is designed to serve." (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged.[14]

---

[13]In the circumstances of the instant case this interpretation would have substantially eviscerated the defense, which was based upon principles of diminished capacity. Although specific intent to commit the underlying felony is necessary to the operation of the felony-murder doctrine (see *People* v. *Sears* (1965) 62 Cal.2d 737, 744 [44 Cal.Rptr. 330, 401 P.2d 938])—so that it is arguable that a defense of diminished capacity would not be entirely unavailable since it could be directed to the issue of intent to commit the underlying felony—nevertheless it is clear that the applicability of such evidence to that narrow issue would be in no way equivalent or comparable to the applicability of such evidence to the broad issue of malice aforethought in the charged offense. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].)

[14]In *People* v. *Marshall* (1957) 48 Cal.2d 394 [309 P.2d 456], we held that an offense was "necessarily included" within the offense charged,

A similar limitation upon the felony-murder rule has been recognized in New York and other states. (See *People* v. *Moran* (1927) 246 N.Y. 100 [158 N.E. 35] ; *People* v. *Wagner* (1927) 245 N.Y. 143 [156 N.E. 644] ; *People* v. *Hüter* (1906) 184 N.Y. 237 [77 N.E. 6] ; *State* v. *Branch* (1966) 244 Ore. 97 [415 P.2d 766] ; *State* v. *Essman* (1965) 98 Ariz. 228 [403 P.2d 540] ; *State* v. *Severns* (1944) 158 Kan. 453 [148 P.2d 488].) Although we are not at this time prepared to say that the limitation which we have above articulated, when applied to fact situations not now before us, will come to assume the exact outlines and proportions of the so-called "merger" doctrine enunciated in these other jurisdictions,[15] we believe that the reasoning underlying that doctrine is basically sound and should be applied to the extent that it is consistent with the laws and policies of this state.

Finally, we note that two decisions of this court dealing with the related question of first degree felony murder have indicated that the limitation recognized in New York is not to be applied in this jurisdiction to preclude a first degree felony-murder instruction based upon a burglary as to which the intended felony is the homicide itself or an offense included therein. (*People* v. *Hamilton, supra,* 55 Cal.2d 881, 901; *People* v. *Talbot* (1966) 64 Cal.2d 691, 703 [51 Cal.Rptr. 417, 414 P.2d 633].) Although we express no present opinion upon the question specifically considered in those cases, we must overrule them to the extent that they contain reasoning or language inconsistent with the instant opinion.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

---

within the meaning of section 1159 of the Penal Code, when the lesser offense *either* was embraced within the statutory definition of the greater *or* was embraced within the specific allegations of accusatory pleading. In *People* v. *Lewis* (1960) 186 Cal.App.2d 585 [9 Cal.Rptr. 263], the court, discussing the effect of *Marshall* upon facts there at bench, properly concluded that "... if the indictment in this case had charged murder with a hatchet, then assault with a deadly weapon, or with means likely to cause great bodily harm would be necessarily included offenses." (186 Cal.App.2d at p. 600.) The rule set forth in *Marshall* and explained in *Lewis,* which relates to whether an offense is "necessarily included" within the meaning of section 1159, is not affected by the rule which we now enunciate, the application of which is limited to the determination of whether a second degree felony-murder instruction is warranted under the evidence. *Marshall* and *Lewis* do show, however, that an offense may be included *in fact* within the offense charged even though it is not embraced within the statutory definition of the greater offense.

[15]See generally Note: *The Doctrine of Merger in Felony-Murder and Misdemeanor-Manslaughter* (1960) 35 St. John's L.Rev. 109.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Coughlin in the opinion prepared by him for the Court of Appeal in *People* v. *Ireland* (Cal.App.) 70 Cal.Rptr. 381.

Respondent's petition for a rehearing was denied April 9, 1969, and the opinion was modified to read as printed above.