[Crim. No. 8449. First Dist., Div. Four. Mar. 2, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN LYNN et al., Defendants and Appellants.

## COUNSEL

Peter A. Whitman, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Robert R. Granucci and Karl S. Mayer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RATTIGAN, J.**—The Lake County Grand Jury returned an indictment charging John Lynn and Larry Thomas Taylor, in count one, with attempted escape from the custody of the Lake County Sheriff (Pen. Code, § 4532, subd. (b)) on October 5, 1967;[1] in count two, with attempted escape from the custody of the same officer, "by force and violence" (*id.*) on October 11; and, in count three, with the murder of Deputy Sheriff William Hoyt (§ 187) on October 11. Count four of the indictment charged Lynn alone with assault with a deadly weapon committed, while a life prisoner (§ 4500), on October 11.[2]

Both defendants originally entered pleas of not guilty to all counts. Their motion for change of venue from Lake County having been granted, the cause was transferred to the City and County of San Francisco. In the course of pretrial proceedings there, defendant Taylor withdrew his plea of not guilty to count one of the indictment and entered a plea of guilty thereto. Both were jointly tried by a San Francisco jury, which returned a verdict finding (1) Lynn guilty of attempted escape under count one of the indictment, (2) both defendants guilty of attempted escape by force and violence under count two, (3) both guilty of murder in the second degree under count three, and (4) acquitting Lynn under count four. Defendants appeal from the several judgments of conviction entered accordingly.

The chronology of events herein began when defendants and one Raymond Pettis (all of whom were state prisoners) escaped, without violence, from a Lake County conservation camp on the night of September 24. We need not summarize in detail the events which followed; it suffices to say that the evidence thereof supports these conclusions: After their escape the trio burglarized two Lake County homes (stealing guns, clothing and other items), kidnaped Mrs. Jack Wruble on September 27, robbed her of her credit cards and cash, stole her automobile, and were arrested in the

---

[1]Except where otherwise indicated, all statutory references herein are to the Penal Code. All dates mentioned occurred in the calendar year 1967.

[2]The indictment also alleged, and subsequent proceedings involved, prior felony convictions as to both defendants. As these are not material to the appeal, they need not be mentioned.

vehicle, near Williams, on the latter date. Booked into the Lake County jail on assorted charges,[3] they met inmates Jolly and Tovar. The five men discussed and partly executed a plan to saw their way out of the jail and, later, to escape by overpowering a guard and seizing his gun. Defendants and Pettis were removed to San Quentin Prison when the sawing-out plan was discovered on October 5; this event produced count one of the present indictment.

The three men were returned to Lake County, on October 11, for arraignment upon the indictment charging them with crimes committed between the camp escape on September 24 and their arrest on September 27. (See fn. 3, *ante.*) The final and fatal events involved an affray which occurred, on October 11, while Deputies Isham and Hoyt were escorting defendants and Pettis from the felony section of the jail to the courtroom of the superior court. The evidence of the melee is confused, but the testimony of four prosecution witnesses supports the following conclusions: Walking in a corridor of the Lake County courthouse, the group (defendants, Pettis, and Deputies Isham and Hoyt) reached the sheriff's radio room, where Mrs. Donna Furman was on duty as dispatcher. Lynn, then Pettis and Taylor, struck Isham. In a struggle for the latter's gun, one shot was fired from it. The evidence was conflicting as to who was holding the gun when it discharged, or as to whether anyone was literally "holding" it in a firing position at that time; it may have been fired accidentally. The bullet struck Deputy Hoyt, who obtained Mrs. Furman's gun, fired a shot which struck Taylor, and died from the first bullet. The altercation ended when the district attorney entered the radio room and retrieved Isham's gun from the floor. Defendants and Pettis were promptly returned to San Quentin, where Pettis died (an apparent suicide) on October 22.

At the commencement of defendants' trial, they moved to limit the prosecutor's opening statement to events which occurred on or after October 5; they further offered certain stipulations (discussed *infra*) concerning their custody in Lake County on pertinent dates. The motion was denied, the stipulation was declined, and the trial court granted defendants a continuing objection to all evidence relating to events which occurred prior to October 5. As part of their case in chief, the People thereupon established the September 24 escape; the two burglaries; the Wruble robbery and kidnaping, and the theft of Mrs. Wruble's automobile; the circumstances of defendants' arrest near Williams on September 27; and their

---

[3]The three men were booked, on September 27, on charges of burglary, robbery, car theft and kidnaping. Shortly thereafter, the Lake County Grand Jury returned an indictment charging them with the September 24 escape, one of the burglaries, the robbery of Mrs. Wruble, and theft of her automobile.

booking at the Lake County jail on the same date.[4] Tovar and Jolly (both of whom had been granted immunity) testified to the conversations and events in the jail prior to October 5.

Both Lynn and Taylor took the stand as defense witnesses. On direct examination, Lynn testified to the October 11 episode only. He described the courthouse affray, but said that it began when he went into a rage and struck Deputy Isham because the latter had "trod or stomped" on his (Lynn's) sore toe. He testified that his subsequent participation in the melee was to prevent anyone from being hurt; that when it began he had no "prearranged plan with Raymond Pettis and/or Larry Taylor to escape from that courthouse"; that he did not "attempt to escape" on October 11; and that his part in the altercation was not carried out with any "intent to escape" on that day. Both defense counsel objected to cross-examination as to any events prior to October 11, upon the ground that such questioning exceeded the scope of direct examination; Lynn also claimed his privilege against self-incrimination. The trial court overruled the objections and denied the privilege, whereupon the prosecutor interrogated Lynn at length concerning all of the above-described events which occurred between September 24 and October 11. Under this questioning, Lynn in effect admitted the September 24 escape, both burglaries, the robbery and kidnaping of Mrs. Wruble, and the theft of the latter's automobile. He described the arrest of the three men near Williams on September 27, and admitted that he "aided" in the attempt to escape from the Lake County jail until the attempt was discovered on October 5 and he was transferred to San Quentin.

On direct examination, Taylor testified that he had entered a plea of guilty to the October 5 escape attempt (as charged in count one of the indictment), but otherwise confined his testimony to the October 11 episode only. According to his account, he fell to the floor for self-protection when the affray started, and did not participate in it in any way. As Lynn had done, he (Taylor) testified on direct that he did not "attempt to escape" on October 11, and was not "part of any plot, plan, conspiracy, [or] compact . . . with anybody else to effect an escape" on that day. Again, and upon the same ground stated as to Lynn, defense counsel objected to cross-examination concerning any events which occurred prior to that day; Taylor claimed privilege. Again, the trial court overruled the objection, denied

[4]The testimony of the People's witnesses to these events has already been summarized; we observe here that the witnesses included three correctional officers from the state conservation camp, three victims of the two burglaries, Mrs. Wruble and her husband, three California Highway Patrol officers who participated in the September 27 arrest, and two Lake County deputy sheriffs who were involved in the subsequent movement of defendants and Pettis to the Lake County jail and their booking there.

the privilege, and permitted detailed cross-examination of Taylor on all matters which occurred between September 24 and October 11. Taylor also admitted the camp escape, the two burglaries, and the episode involving Mrs. Wruble; described the arrest near Williams; and admitted engaging in the escape attempt which was terminated on October 5.

In his argument to the jury the prosecutor discussed at length all of the chronological events in evidence, commencing with the conservation camp escape. He referred to the full sequence as a "crime spree," and dwelt upon the defendants' arming themselves prior to their capture and confinement on September 27. The trial court instructed the jury concerning the limited purposes for which the evidence of the prior crimes was to be considered,[5] and concerning principals to crime, aiding and abetting, and conspiracy. In the course of complete instructions upon murder, the court instructed upon murder in the second degree and the second degree felony-murder rule.[6]

Defendants claim prejudicial error in the trial court's admission of the evidence, in the People's case in chief, showing the crimes committed prior to October 5; in the scope of interrogation permitted the prosecutor in cross-examining them (defendants) as to the events which preceded October 11; in the trial court's instructing upon second degree felony-murder; and in certain irregularities asserted to have prejudiced defendants in the grand jury proceedings which preceded their indictment. For the reasons

---

[5]The court gave CALJIC 33 on this subject, but included therein only subdivisions (2), (3), (5) and (6) (relating to the purposes of showing motive, intent, knowledge and plan, respectively).

(All references to "CALJIC" herein are to California Jury Instructions—Criminal (rev. ed. 1958), including the 1967 pocket supplement thereto.)

[6]The trial court gave an adaptation and elaboration of CALJIC 305 (Revised) on these subjects, as follows:

"Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation.

"Murder of the second degree is also the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose, and with wanton disregard for human life.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being.

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs . . . as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of escape by force and violence, and where there was in the mind of the perpetrator the specific intent to commit such crime, is also murder of the second degree.

"The specific intent to commit escape by force and violence and the commission of, [*sic*] or attempt to commit such crime, must be proved beyond a reasonable doubt."

next stated, none of these contentions can be sustained; we affirm the judgments of conviction.

### The Evidence of Other Crimes

■    Subject to certain recognized exceptions, evidence of other offenses may not be introduced in a criminal prosecution. (*People* v. *Schader* (1969) 71 Cal.2d 761, 772 [80 Cal.Rptr. 1, 457 P.2d 841]; cf. *People* v. *Durham* (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198] and cases cited.)    ■    One of the exceptions "permits the People to adduce as circumstantial proof of the crime charged evidence encompassing the commission of a similar or related offense when the probative value of such evidence outweighs its prejudicial effect. [Citations.]" (*People* v. *Schader, supra*, at p. 773.)    ■    Determination of the admissibility of such evidence requires the trial court to balance the opposing elements of probative value and prejudicial effect. (*People* v. *Schader, supra*, at p. 774.) The balance must be struck with great care (*id.; People* v. *Durham, supra*, at pp. 186-187) and according to guidelines addressed to the probative value of the evidence in terms of its relevance, materiality and necessity: "[b]efore permitting the jury to hear evidence of other offenses the [trial] court must ascertain that the evidence (a) 'tends logically, naturally and by reasonable inference' to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue." (*People* v. *Schader, supra*, at pp. 774-775. Footnoted citations omitted.)

■    Although the balance is frequently struck in favor of admitting evidence of other crimes showing a *modus operandi* similar to that employed in the crime charged (see, e.g., *People* v. *Schader, supra*, 71 Cal.2d 761 at pp. 776-777; *People* v. *Haston* (1968) 69 Cal.2d 233, 245-247 [70 Cal.Rptr. 419, 444 P.2d 91]), we may accept defendants' contention that such theory is questionable here because of the different procedures followed by defendants on September 24, between September 27 and October 5, and on October 11. But a common *modus operandi* is not the exclusive element upon which the balancing process will favor probative value and admissibility: other elements are "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Evid. Code, § 1101, subd. (b).) Variations on some of these include elements such as proof of conspiracy where relevant (*People* v. *Durham, supra*, 70 Cal.2d 171 at pp. 180 [fn. 7], 182 [fn. 9]) and proof of "the actor's mental state" in association with motive for the crime charged. (*Id.*, at pp. 188-189.)

■ Of the full time span involved here (September 24 to October 11), the events of the jail-cell phase (September 27 to October 5) were wholly "relevant, material and necessary" as to Lynn because he went to trial under a plea of not guilty to the escape attempt which count one of the indictment dated at October 5. As to both defendants, however, evidence of the full pre-October 5 chronology tended to show that they jointly formulated, as early as September 24, a common plan to escape from custody; that they first executed it on September 24 and thereafter carried it forward by arming themselves, by accumulating food, clothing and other provisions, and by stealing an automobile; that their recapture on September 27 interrupted the plan's execution but not the continuity of the plan itself, which they further plotted and pursued in the Lake County jail with a different mode of execution as required by the circumstances of their confinement there; and that, subject to their denials of further continuity (which only established an evidentiary conflict to be resolved by the jury), they were still executing the plan (but by violence) in commencing and participating in the October 11 altercation which produced the death of Deputy Hoyt.

The evidence of the pre-October 5 events was therefore relevant and material to show motive, intent and knowledge (at least) on the part of either defendant on October 11 (Evid. Code, § 1101, subd. (b); *People* v. *Schader, supra,* 71 Cal.2d 761 at pp. 773-774); the existence of their common escape plan as such,[7] as collateral proof of their motive, intent and knowledge which were among its features; and the basis (with reference to Taylor in particular) of criminal liability for aiding and abetting within the scope of an on-going conspiracy. (*People* v. *Durham, supra,* 70 Cal.2d 171 at pp. 180-181; see, particularly, *id.,* fn. 7.)

■ The other-crimes evidence in question was also relevant, material and necessary to show the existence and details of defendants' continuing escape plan as the basis for application of the felony-murder rule, and the second degree felony-murder rule in particular, to the Hoyt homicide charged in count three of the indictment. "The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of

---

[7]The typical application of the "plan" theory of admissibility permits proof of other crimes which were *unrelated* to the crime charged except for such similarities thereto as support the inference that there existed a "plan" from which the trier of fact could infer guilt of the similar crime charged. (See e.g., *People* v. *Cramer* (1967) 67 Cal.2d 126, 130 [60 Cal.Rptr. 230, 429 P.2d 582] and cases cited.) We conceive that the present other-crimes evidence was admissible, not as the basis for this precise succession of inferences, but to show and characterize a currently formulated "plan" in which the other crimes shown were directly *related* to the crimes charged because all were features of the plan's execution. (See *People* v. *Durham, supra,* 70 Cal.2d 171 at pp. 180-181.)

*all* felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought *and* to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated in section 189 of the Penal Code. [Citations.] Thus, '[a] homicide that is a direct causal result . . . of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder.' [Citation.]" *People* v. *Ireland* (1969) 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580], italics by the *Ireland* court.)

A hindsight view of the courthouse altercation on October 11 produces the clear conclusion that the Hoyt homicide was the "direct causal result" of an attempt by defendants and Pettis to escape from the sheriff's custody "by force and violence," a crime not enumerated in Penal Code section 189 but a felony nonetheless. (§ 4532, subd. (b).) From a pretrial viewpoint, it was incumbent upon the prosecution to prove that the underlying felony had occurred, and that it was "inherently dangerous to human life," in order to obtain a murder conviction (in the second degree, at least) under the theory of second degree felony murder. The evidence of all the pre-October 11 events was relevant, material and necessary to establish that the October 11 altercation was in fact a commission of the underlying felony pursuant to the preplanning thereof and the preplanning of the force and violence[8] which, as used, made the felony "inherently dangerous to human life" for second degree felony murder purposes.[9]

---

[8]The preplanning of the underlying felony (attempted escape on October 11) was shown, at the least, by evidence of the continuous events involving defendants' escape from custody on September 24; their acquisition of clothing, provisions, credit cards, money and an automobile, and their subduing Mrs. Wruble to implement their flight from the area; their renewed efforts to escape from the Lake County jail between September 27 and October 5; and their determination to effect escape as expressed in the jail conversations to which Tovar and Jolly testified. The preplanning of the "force and violence" element was shown by evidence of defendants' progressive acquisition of guns and ammunition in the burglaries, by the use of force upon Mrs. Wruble, and by the jail conversations relative to the overpowering of guards, and the seizing of guns, to effect escape in the future.

[9]The determination that the underlying felony is "inherently dangerous to human life" for these purposes requires the courts to "look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Nichols* (1970) 3 Cal. 3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673] [quoting *People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 (47 Cal.Rptr. 7, 406 P.2d 647); *People* v. *Phillips* (1966) 64 Cal.2d 574, 582 (51 Cal.Rptr. 225, 414 P.2d 353)].) Attempt to escape from a sheriff's custody "by force and violence" is not in itself a felony: the attempted escape is, but the element of "force and violence" merely produces more severe punishment. (§ 4532, subd. (b).) By definition, however, such attempt "by force and violence" involves a forcible assault upon the entire custodial apparatus, which is staffed by personnel who are customarily armed with lethal weapons and who are dutybound to resist force with force. It therefore appears that an attempted escape from a

■ Although the extent of a defendant's "testimonial admissions" as to other crimes is a factor in the assessment of the materiality of evidence thereof (*People* v. *Schader, supra,* 71 Cal.2d 761 at pp. 775-776 and cases cited), the evidence in question did not become immaterial by reason of defendants' offer to stipulate in certain respects. Lynn's counsel offered to stipulate that he (Lynn) was "properly in the custody of the Lake County Sheriff on the 5th day of October," charged with "certain felonies" not described. Taylor's offer was to stipulate that "on the dates [*sic*] alleged . . . he [Taylor] . . . had been arrested, that he was lawfully booked," and that he was charged with "certain felonies" not to be enumerated.[10] These offers reached only the bare fact of custody as a single element of the attempted escapes charged, and mentioned only "certain felonies" underlying that custody. For the reasons previously stated with respect to defendants' continuous escape plan, it was the specific nature, progression and details of the prior felonies which imparted materiality to the evidence thereof in this prosecution. Consequently, defendants' offers to stipulate did not render such evidence inadmissible, because the offers were not sufficiently broad "to cover the crucial probative fact[s] involved in the prior offense[s]." (*People* v. *Schader, supra,* at p. 776, fn. 14, discussing *People* v. *Burkhart* (1931) 211 Cal. 726, 732 [297 P. 11] and comments related thereto.)

■ Defendants finally contend that the People's evidence of the pre-October 5 events, on the prosecution's case in chief, was erroneously admitted because it was "unnecessary" in that it was cumulative. The evidence in question was long and detailed, and the People presented many witnesses in introducing it. The witnesses' testimony was repetitive to some extent, but it was progressive in point of time and most of it was necessary to show the events, and to authenticate the various criminal instruments and methods, which we have already determined to have been relevant and material. (See text at fn. 8, *ante.*) Accordingly, and under all the circumstances, we conclude that this evidence was not *"merely* cumulative with respect to other evidence which the People . . . [might have used] . . . to prove the same issue[s]." (*People* v. *Schader, supra,* 71 Cal.2d 761 at p. 775 [footnoted citations omitted; italics added].)

---

sheriff's custody "by force and violence," its elements viewed "in the abstract," is inherently dangerous to human life. (Compare *People* v. *Williams, supra*; *People* v. *Phillips, supra,* at p. 583; *People* v. *Satchell* (1971) 15 Cal.App.3d 330 [93 Cal.Rptr. 69].) We do not so hold, nor do we make any holding, as to the underlying felony of attempted escape, or escape, without "force and violence."

[10]Lynn's offer pertained only to the "5th of October," was made in connection with his motion to strike from the indictment a reference to the prior crimes, and was withdrawn when the trial court indicated that his motion would be denied. It was Taylor's offer to stipulate (which apparently pertained to October 5 and 11 alike) that was expressly declined by the People.

The trial judge fully weighed the admissibility problem presented by the evidence of the pre-October 5 events, scrupulously heeded the requirement that "[s]uch evidence should be scrutinized with great care . . . in light of its inherently prejudicial effect" and indicated that he had admitted it after he had "clearly perceived" its relevance, materiality and necessity in connection with the crimes charged. (*People* v. *Durham, supra,* 70 Cal.2d 171 at pp. 186-187; *People* v. *Kelley* (1967) 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947].) It thus clearly appears that, having carefully balanced the probative value of the other-crimes evidence against its prejudicial effect, the trial court concluded that the former outweighed the latter. Because a balance was struck as required (*People* v. *Schader, supra,* 71 Cal.2d 761 at p. 774 [80 Cal.Rptr. 1, 457 P.2d 841]), and because we agree with the conclusion reached, we find no error in the admission of the challenged evidence.

### The Scope of Defendants' Cross-Examination

Defendants' contentions concerning the scope of cross-examination permitted the prosecutor, when both defendants were testifying, rest upon the familiar rule that cross-examination must be "within the scope of the direct examination." (Evid. Code, § 761; *id.,* § 763; Witkin, Cal. Evidence (2d ed. 1966) [hereinafter Witkin], § 1202, pp. 1110-1111.) ■ Although the trial court is ordinarily vested with a large measure of discretion in this respect (Witkin, § 1202, p. 1111, § 1200, pp. 1108-1109), it has been stated that the judge in a criminal case "has no discretion to allow the defendant, over objection, to be cross-examined beyond the scope of the matters to which he voluntarily testified on direct examination"; thus the scope of direct determines the extent to which he waives his constitutional privilege against self-incrimination by electing to testify at all. (Witkin, § 1204, p. 1112, § 911, par. (a), p. 845. Cf. *People* v. *Ing* (1967) 65 Cal.2d 603, 610 [55 Cal.Rptr. 902, 422 P.2d 590].)

Once a defendant does elect to take the stand, however, he waives his federal and state constitutional privileges to the extent of the permissible scope of cross-examination. (*People* v. *Ing, supra,* 65 Cal.2d 603 at pp. 610-611). He cannot artificially limit that scope by limiting his direct testimony (*People* v. *Teshara* (1904) 141 Cal. 633, 638 [75 P. 338]); and where he makes a "general denial of the crime [charged] the permissible scope of cross-examination is very wide." (*People* v. *Ing, supra,* at p. 611 and cases cited. Cf. *People* v. *Schader, supra,* 71 Cal.2d 761 at p. 775 [fn. 13].) ■ Here, both Lynn and Taylor denied having committed the crime of attempted escape on October 11, as charged in count two of the indictment, and the testimony of each essentially exculpated him with reference to the Hoyt homicide which occurred in the altercation on that date. We

conclude that cross-examination was relevant and permissible as to all of the preceding events, back to and including September 24, because (as previously discussed) those events tended to show a preplanned escape scheme, of which the episode of October 11 was a feature and the evidence of which directly controverted each defendant's testimonial denial as to that date. As in *People* v. *Tarantino* (1955) 45 Cal.2d 590 [290 P.2d 505] "[t]he cross-examination . . . was directed primarily to matters implicit in . . . [defendants'] . . . general denial, . . . [their] . . . purpose and motive, . . . [their] . . . *general plan and scheme.*" (*People* v. *Tarantino, supra,* at p. 599, italics added. Cf. *People* v. *Ing, supra,* at p. 611; *People* v. *Schader, supra,* at p. 775, fn. 13. See fn. 7, *ante.*) It follows that the trial court properly denied each defendant's respective claim of constitutional privilege (*People* v. *Ing, supra*), and ordered each of them to respond to the cross-examination permitted.

### The Second Degree Felony-Murder Instruction

As we have previously indicated, the evidence of the courthouse affray on October 11, with the proof of the events which preceded it, fully supported the second degree felony-murder instruction as given. (See fn. 6, *ante.*) Defendants challenge the instruction upon the further ground that it withdrew the issue of malice from the jury by discounting, in effect, Lynn's testimony that he started the October 11 altercation because of a "rage" resulting from Deputy Isham's stepping on his (Lynn's) sore toe. In the decision principally cited for this point, however, the instruction was proscribed because it "substantially eviscerated the defense, which was based upon principles of diminished capacity." (*People* v. *Ireland, supra,* 70 Cal.2d 522 at p. 539, fn. 13.) The *Ireland* situation does not appear in the present evidence; neither defendant pursued a diminished-capacity defense in his proof or in the instructions, and both expressly disclaimed it. The argument, moreover, ignores the essence of the *Ireland* holding, which states that the instruction in question "may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*People* v. *Ireland, supra,* p. 539 [footnote omitted; italics by the *Ireland* court]. See also *People* v. *Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193].) The felony involved here (attempted escape from a sheriff's custody by force and violence) was not "an integral part of the homicide," and the prosecution's evidence thereof did not show it to be included in fact within the offense charged. For these reasons, the trial court did not err in giving the instruction.

### The Grand Jury Proceedings

■ Defendants also make certain contentions based upon irregularities claimed to have occurred in the grand jury proceedings which produced the present indictment. In the first place, defendants' contentions are not supported by a record of the proceedings in question; a transcript thereof has not been included in the record on appeal. (See rules 4(b), 33(b) and 52, California Rules of Court.) Secondly, it appears that defendants are advancing this specific point for the first time on appeal. (See *People* v. *Harris* (1967) 67 Cal.2d 866, 870 [64 Cal.Rptr. 313, 434 P.2d 609].) Third, and on the merits of their contentions, defendants have not persuaded us that either of them was prejudiced by the matters of which both complain. (See *People* v. *Rojas* (1969) 2 Cal.App.3d 767, 770 [82 Cal. Rptr. 862].)

The judgments of conviction are affirmed.

Devine, P. J., and Christian, J., concurred.

A petition for a rehearing was denied March 26, 1971, and appellants' petition for a hearing by the Supreme Court was denied May 13, 1971.