66 Cal.Rptr.3d 409 (2007)
155 Cal.App.4th 929
The PEOPLE, Plaintiff and Respondent,
v.
Anthony Robert GARCIA, Defendant and Appellant.
No. B187968.
Court of Appeal of California, Second District, Division Eight.
September 27, 2007.
*412 Edward H. Schulman, under appointment by the Court of Appeal, Los Angeles, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Steven D. Matthews and Shawn McGahey Webb, Deputy Attorneys General, for Plaintiff and Respondent.
RUBIN, J.

INTRODUCTION
Appellant Anthony Robert Garcia challenges his murder, attempted murder, and shooting at an inhabited dwelling convictions on the grounds of prosecutorial misconduct, instructional error, and sentencing error. We conclude the prosecutor did not engage in prejudicial misconduct. The trial court correctly instructed the jury regarding the requisite intent for attempted murder with an allegation of premeditation and deliberation and was not required to instruct on firing a gun with gross negligence as a lesser included offense. The court permissibly sentenced appellant for both attempted murder and shooting at an inhabited dwelling; enhanced his sentence under Penal Code section 12022.53, subdivision (c); and stayed enhancements under Penal Code section 12022.53, subdivision (b).

BACKGROUND AND PROCEDURAL HISTORY
On the night of February 11, 2005, Robert Rojas stepped outside his house after he heard shouting. Four or five men approached him from the front of the lot and one of them asked where he was from. He replied, "Nowhere." The man cursed Rojas and said "Sereno," which was the name of a nearby gang. The men then began to shoot at him. Rojas's mother, Rosa De La Torre, looked at a surveillance system monitor and saw a black sports utility vehicle (SUV) stopped on the street near the front of the lot. Shots struck the house, but missed Rojas, who ran.
Police officers, who were en route to investigate a report of a woman screaming about a gun, observed Dina Acuna in the driver's seat of a dark green Ford Explorer. They heard her screaming at appellant, who was seated in the front passenger seat. The officers stopped the SUV, and Acuna got out and spontaneously said, "He's dead" or "He's been shot." The officers found Jesse Garcia dead in the back seat, with a semi-automatic handgun in his waistband. They detained appellant and Acuna. A subsequent search of the Explorer's cargo area uncovered a significant quantity of live ammunition of various calibers, including calibers matching casings and a bullet fragment found at Rojas's home.
In appellant's original trial, the jury acquitted him of first degree murder, but could not reach a verdict on the lesser included offense of second degree murder or the remaining counts. The court declared a mistrial.
At appellant's re-trial, the jury convicted him of second degree murder, attempted *413 murder, and shooting at an inhabited dwelling. The jury found each crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. It further found that the attempted murder was willful, deliberate and premeditated, and that in the commission of the murder and attempted murder, a principal personally used a gun and personally and intentionally fired a gun (Pen.Code, § 12022.53, subd. (b) and (c)).
The court sentenced appellant to consecutive terms of 35 years to life, life plus 20 years, and life in prison.

DISCUSSION

1. The prosecutor did not engage in prejudicial misconduct.

a. Forensic testing of appellant's gloves
Los Angeles Police Department (LAPD) Detective Carey Ricard testified that when appellant was detained, he was wearing a black short-sleeved T-shirt, blue jeans, sandals, and black or dark blue gloves. Because appellant was wearing gloves, no gunshot residue test was performed on him. Police officers removed appellant's gloves and booked them into evidence. Under departmental policy, the gloves were not tested for gunshot residue, but were preserved to enable the prosecution or defense to analyze them. The prosecutor asked Ricard whether he knew "if there was any request made to retrieve that by any defense party at all or any defense expert?" Defense counsel objected that the question constituted improper comment upon the burden of proof. The court overruled the objection. The prosecutor restated the question as follows: "Are you aware of the gloves ever being checked out either by a defense expert or defense investigator for evaluation?" Ricard replied, "Yes." When asked what "the answer to that" was, he stated, "It was checked out by a defense investigator, defense criminalist, actually along with other items." Ricard explained the "other items" to which he referred were "[a]ll the ballistic items...." Ricard then reiterated that the gloves were not tested by the LAPD.
The following day, defense counsel again raised the issue, and informed the court that the prosecutor knew from the prior trial that counsel for former co-defendant Mendez had the "ammo" examined, but her question to Ricard left the jury with the false impression that items were examined by appellant's counsel or investigator. Appellant's attorney subsequently noted that because the court had prohibited everyone from mentioning another defendant, he had not been able to cure the false impression by asking Ricard whether it was the attorney for another defendant who had had the evidence analyzed. The court agreed that it inferred from the questioning that someone acting on behalf of appellant had tested the gloves. The prosecutor argued that Mendez's counsel in the former trial shared discovery with appellant's attorney. Appellant's attorney admitted that all discovery from co-defendant Mendez was available to him, but stated he had not actually received any report regarding gunshot residue. The court decided it must give a limiting instruction, and therefore told the jury the following: "Before we begin with the resumption of the direct testimony of Officer Skiver, I want to mention something that came up yesterday in the testimony. [¶] When Detective Ricard was on the stand, I sensed at one point that there was a suggestion that the defense had tested the gloves in this case. And there is no evidence *414 before you that the defense ever tested the gloves in any way. And so you are not to consider that as possible evidence. There was no test. Or there is no evidence of any test, is the way I should say it."
Appellant contends the prosecutor committed misconduct by asking about defense testing of the gloves because she knew appellant's attorney never had access to any test results regarding the gloves and, even with the court's admonition, the jury was permitted to speculate that the gloves had been tested and the results were harmful to appellant's defense.
Conduct by a prosecutor that does not violate a ruling by the court is misconduct only if it amounts to the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury or is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (People v. Silva (2001) 25 Cal.4th 345, 373, 106 Cal.Rptr.2d 93, 21 P.3d 769.) "It is misconduct for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means." (People v. Price (1991) 1 Cal.4th 324, 481, 3 Cal.Rptr.2d 106, 821 P.2d 610.)
The record is unclear whether the gloves were actually tested for gunshot residue on behalf of former co-defendant Mendez, or whether the prosecutor believed they were. According to Ricard's testimony, they were. The day after the challenged testimony, the prosecutor told the court she understood from discussions with Mendez's attorney that the gloves were examined for gunshot residue. Appellant's counsel said he did not know whether the gloves were tested, and admitted that all of Mendez's discovery was available, but denied receiving anything about gunshot residue. He suggested that Mendez's counsel may have manipulated both appellant's counsel and the prosecutor. During the original trial, Mendez's counsel told the court that "only that one weapon and casings evidence" were made available to a defense criminalist. The prosecutor replied that "all of the firearms evidence" was made available to the defense. The record reveals no discussion about gunshot residue testing of the gloves. Appellant's characterization of the record is therefore inaccurate. It simply does not demonstrate that the prosecutor knew, before asking the question, that appellant's counsel never had access to test results on the gloves.
In any event, the court properly determined that the prosecutor had improperly created the impression that counsel for appellant had obtained testing of the gloves. The court gave a strong curative admonition. While it would have been more effective if the curative admonition had been given just after the testimony in question, appellant did not explain his rationale to the court until the following day. As soon as appellant explained the problem, the court immediately agreed with him and promptly gave the curative admonition. We must presume jurors obeyed the admonition and did not consider as evidence the possibility that the defense tested the gloves. The prosecutor created some risk of reviving the prohibited inference when she rhetorically asked during argument, "Why wasn't a witness called to corroborate that there was no gunshot residue if you believe there was no gunshot residue on those gloves."[1] Defense counsel's *415 vigorous argument on this point, however, blunted or negated any potential prejudice. He argued the LAPD should have tested the gloves if it was trying to find the truth, and the existence of its departmental policy did not make the policy right. Defense counsel continued, "Counsel has the audacity to imply that I could have tested them when not only does the defense not have the burden of proof but it's not even their policy to do it themselves. That's twisted. That is not seeking the truth. That is seeking a result in a case...." Moreover, the potential prejudice of the prosecutor's implication, reinforced by her argument, was dissipated by jury instructions that statements made by the attorneys were not evidence; jurors must decide all questions of fact from the evidence, not from any other source; neither side was required to call all witnesses with relevant knowledge; and that the prosecution bore the burden of proving appellant guilty beyond a reasonable doubt. (People v. Hughey (1987) 194 Cal. App.3d 1383, 1396, 240 Cal.Rptr. 269.)

b. Dina Acuna
Appellant further contends the prosecutor committed misconduct with respect to witness Dina Acuna.
Acuna was appellant's girlfriend. They had six children together. She refused to testify at the first trial, despite a grant of use immunity, and was held in contempt, for which she served a jail sentence.
The prosecutor called Acuna again at the re-trial, again with a grant of immunity, and she again refused to testify to anything other than elementary biographical matters. Outside of the presence of the jury, the court found Acuna in contempt. The court later told the jury, "Miss Acuna is not going to be testifying at this time."
Appellant contends the prosecutor acted improperly by calling Acuna as a witness, while "knowing full well that Acuna would once again refuse to testify."
Where an appellant complains of prosecutorial misconduct for the first time on appeal, the issue becomes whether such misconduct caused a miscarriage of justice only if, considering the alleged misconduct in context, a timely objection and admonition would not have cured the harm or an objection and request for admonition would have been futile. (People v. Hill (1998) 17 Cal.4th 800, 820, 72 Cal.Rptr.2d 656, 952 P.2d 673.) Discussions outside the presence of the jury demonstrate that appellant knew the prosecutor was going to call Acuna as a witness at the retrial, yet appellant never objected that doing so would be improper. Nor did he object when the prosecutor actually called her as a witness, despite ample opportunity to do so during discussions and a hearing with Acuna outside the presence of the jury. Appellant's failure to object forfeited his claim that calling her as a witness was error.
Moreover, appellant has not established that the prosecutor knew Acuna would again refuse to testify. Indeed, in discussion regarding the authentication of photographs of appellant the defense wanted to introduce, defense counsel stated he could ask Acuna to authenticate the photographs, and then said, "I am just looking ahead now if we have the same problem with her which we had last trial, which we don't anticipate, which is some lack of testimony, then obviously I would need to go to plan B...." Defense counsel went on to suggest the form of the questions he would ask Acuna in order to authenticate the photographs. If defense counsel did not think Acuna would create the "same problem" in the retrial, the prosecutor cannot *416 be assumed to have anticipated a repeat performance.
In her opening argument, the prosecutor argued, in pertinent part, "You also have the fact that Dina's loyalties are very important because loyalty and respect are critical in the gang life. [¶] Dina is a gang member." The court sustained a defense objection on the ground the prosecutor misstated the evidence. The prosecutor then argued that Acuna had admitted she was a member of the El Sereno gang. The defense objected; the court indicated that was not its recollection, and asked the prosecutor to move on. The prosecutor then argued, in pertinent part, "Officer Skiver said that Dina was from El Sereno.... She's a critical witness. She elected not to testify. [¶] It's imperative that you think about the loyalty and the respect aspects and the fear issues should she have chosen to obey the court's order and testify. [¶] You know from officerDetective Ricard in the statement to the defendant he offered relocation for her and her family if she chose to cooperate." The defense objected, and the court ordered the prosecutor to move on. The court told the jury, "We're not going to Miss Acuna. She did not testify in this case. You are not to speculate about it."
A little later, the prosecutor returned to the same topic, while arguing that gang members do not testify against one another due to loyalty and fear of retaliation. She argued, "Dina Acuna is obviously critical. She has evidence. She willingly refused to testify and violated the court's order." Defense counsel objected, and the court stated, "Again, ladies and gentlemen, all you know about her is she did not testify."
Appellant contends that the final segment of argument quoted above constituted misconduct. He argues the prosecutor intended the jury to infer that Acuna declined to testify to avoid incriminating appellant.
A prosecutor may fairly comment on and argue any reasonable inferences from the evidence. (People v. Dennis (1998) 17 Cal.4th 468, 522, 71 Cal. Rptr.2d 680, 950 P.2d 1035.) If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, the issue becomes how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument. (People v. Benson (1990) 52 Cal.3d 754, 793, 276 Cal.Rptr. 827, 802 P.2d 330.) No misconduct exists if a juror would have taken the statement to state or imply nothing harmful (Ibid.)
The prosecutor's initial argument regarding Acuna's refusal to testify cited only gang loyalty, and was terminated by the court, which promptly instructed the jury not to speculate about Acuna's refusal to testify. The prosecutor then focused her argument on the alleged gang status of appellant and the known participants in the crime, and the gang significance of various aspects of the case. Just before the prosecutor resumed her argument about Acuna, she referred to the testimony of Aaron Skiver, whom she called as a gang expert, regarding gang members' practice of refusing to testify against other gang members due to loyalty and fear of retaliation. She referred to appellant's own statements to the police that he did not want to be a "rat," and said his statements were consistent with Skiver's testimony. The prosecutor then made the challenged argument regarding Acuna. After the court admonished the jury, the prosecutor continued to talk about the purported gang code of silence: "The expert told you about the fact that fear, intimidation and loyalty is what rules the gang. Within the gang and not being a stitch *417 [sic] and not being a rat is what a gang members [sic ] lives by."
The context of the argument in controversy dealt with the principle that gang members will not testify due to gang loyalty and the fear of retaliation. Given this context and the prosecutor's earlier arguments about Acuna's gang loyalty and membership, it is not likely that reasonable jurors would have understood the prosecutor's argument to mean Acuna refused to testify because her testimony would have incriminated appellant, as opposed to her loyalty to and fear of the gang. Moreover, the inference appellant argues the jury drew is a natural one stemming from inherent bias. Such an inference was permissible, and the jury was instructed on this point (CALJIC No. 2.20).
Even assuming that the prosecutor's final argument regarding Acuna was misconduct, it is not reasonably probable that appellant would have obtained a more favorable result absent the argument. (People v. Ochoa (2001) 26 Cal.4th 398, 442, 110 Cal.Rptr.2d 324, 28 P.3d 78.) The court promptly reminded the jury that it could not speculate about Acuna. It also instructed the jury that statements made by the attorneys were not evidence, and jurors must decide all questions of fact from the evidence, and not from any other source. The jury heard from the arresting officer that Acuna was driving the SUV containing appellant and the decedent's body, and they heard appellant's statement to the police that Acuna Was driving when they picked up "Lefty" and "Husky" and dropped them off near the scene of the crimes. The jury would naturally infer that Acuna had at least some information about the crimes. They knew she had refused to testify. Although the jury did not know the extent of the court's discussions with Acuna, they had twice heard Acuna refused to obey the court's direction to answer questions, and it is highly likely they understood the prosecutor's argument to refer to that refusal. Accordingly, any error was harmless.

2. The court properly instructed the jury on an aider and abettor's liability for attempted murder with an allegation of premeditation and deliberation.
Appellant contends the jury instructions regarding attempted premeditated and deliberate murder were erroneous because they did not require the jury to find that each aider and abettor shared the actual perpetrator's intent to kill. Appellant recognizes that the California Supreme Court concluded such intent was not required (People v. Lee (2003) 31 Cal.4th 613, 616, 3 Cal.Rptr.3d 402, 74 P.3d 176), but asks this court to follow the dissenting opinion of Justice Kennard by finding error. We are bound by the majority's decision in Lee and decline appellant's invitation to reject it. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal. Rptr. 321, 369 P.2d 937.)

3. The trial court was not required to instruct upon grossly negligent discharge of a gun as a lesser included offense.
Appellant contends the court was required to instruct, sua sponte, on willfully firing a gun in a grossly negligent manner as a lesser included offense of firing a gun at an inhabited dwelling.
A court must instruct sua sponte on a lesser included offense where evidence, if believed by the trier of fact, would absolve the defendant of the greater offense, but not of the lesser. (People v. Memro (1995) 11 Cal.4th 786, 871, 47 Cal. Rptr.2d 219, 905 P.2d 1305.) This is true in spite of the defendant's wishes, trial *418 theories or tactics. (People v. Breverman (1998) 19 Cal.4th 142, 162, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)
An offense is necessarily included in another if either the statutory elements of the greater offense or the facts alleged in the accusatory pleading include all of the elements of the lesser offense, so that the greater offense cannot be committed without also committing the lesser. (People v. Sanchez (2001) 24 Cal.4th 983, 988, 103 Cal.Rptr.2d 698,16 P.3d 118.)
Penal Code section 246[2] "is violated when a defendant intentionally discharges a firearm either directly at a proscribed target (e.g., an inhabited dwelling house or occupied building) or in close proximity to the; target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it. No specific intent to strike the target, kill or injure persons, or achieve any other result beyond shooting at or in the general vicinity or range of the target is required." (People v. Overman (2005) 126 Cal.App.4th 1344, 1361, 24 Cal.Rptr.3d 798 (Overman).)
To convict a defendant for violating section 246.3, the jury must find that "(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; [and] (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person." (People v. Alonzo (1993) 13 Cal.App.4th 535, 538, 16 Cal.Rptr.2d 656 (Alonzo).)
Overman, supra, 126 Cal.App.4th at p. 1360, 24 Cal.Rptr.3d 798, held that section 246.3 was a lesser included offense of section 246. The court noted, "The only difference between sections 246 and 246.3 is that section 246 requires that a specific target (e.g., an inhabited dwelling or an occupied building) be in the defendant's firing range," whereas section 246.3 does not. (Overman, supra, 126 Cal.App.4th at p. 1362, 24 Cal.Rptr.3d 798.) "Both crimes, however, involve the intentional discharge of a firearm in a grossly negligent manner which presents a significant risk that personal injury or death will result." (Ibid.)
Respondent argues that Overman is wrong because section 246.3 also requires "the presence of a person who actually could be injured or killed as a result of the shooting." This contention misconstrues dictum in People v. Clem (2000) 78 Cal. App.4th 346, 92 Cal.Rptr.2d 727 (Clem). Clem held that a violation of section 246.3 constituted an offense that is inherently dangerous to human life, for purposes of second degree felony murder. (Id. at p. 348, 92 Cal.Rptr.2d 727.) The court rejected an argument that a violation "`neither requires nor presumes the presence of people in harm's way,'" by stating, "section 246.3 presupposes that there are people in harm's way. Since the offense involves gross negligence ... it must appear that the defendant's act `actually had the potential for culminating in personal injury or death.'" (Id, at pp. 351-352, 92 Cal. Rptr.2d 727, quoting People v. Alonzo, supra, 13 Cal.App.4th at p. 539, 16 Cal. Rptr.2d 656.) Respondent argues, in reliance upon Clem and Alonzo, that shooting at a house whose inhabitants have left on vacation would violate section 246, but not section 246.3.
Alonzo, supra, 13 Cal.App.4th at p. 539, 16 Cal.Rptr.2d 656, upon which Clem relied, reviewed the legislative intent for section 246.3 to construe the statutory phrase "discharges a firearm in a grossly negligent manner which could result in injury *419 or death to a person." Alonzo noted that the requirements of gross negligence and the modifying phrase "which could result in injury or death to a person" were added in the two final amendments. The court then stated, "Since the Legislature did not define `gross negligence' for purposes of the statute, it appears from the statutory language and the legislative history that it intended that term to have the meaning commonly attributed to it in criminal law, but to criminalize such conduct only if, under the circumstances, it actually had the potential for culminating in personal injury or death." (Id. at p. 539, 16 Cal. Rptr.2d 656.) In context, it is clear that the Alonzo court was simply attempting to paraphrase the statute to describe the legislative intent.
Neither Alonzo nor the dictum in Clem supports respondent's purported requirement that any human actually be present inside a structure that is fired upon to constitute a violation of section 246.3. No requirement of human presence is stated in section 246.3. Nor is such a requirement stated in Overman, supra, 126 Cal. App.4th 1344, 24 Cal.Rptr.3d 798; Alonzo, supra, 13 Cal.App.4th 535, 16 Cal.Rptr.2d 656; or the standardized jury instructions pertaining to section 246.3.[3] At most, Alonzo and Clem provide an alternative formulation or interpretation of the statutory phrase "which could result in injury or death to a person," i.e., "reasonable grounds to suspect that people will be endangered" or a "reasonably foreseeable threat to human life." (Clem, supra, 78 Cal.App.4th at p. 352, 92 Cal.Rptr.2d 727.) As noted in Clem, this state of affairs might be absent in an "isolated place[ ]" but not in the immediate vicinity of a dwelling, other building, or place where people are generally found. (Ibid.)
Accordingly, we agree with the conclusion in Overman, supra, 126 Cal.App.4th at page 1360, 24 Cal.Rptr.3d 798. Section 246.3 is a lesser offense necessarily included within section 246.
Nonetheless, the court was not required to instruct upon a violation of section 246.3 because no evidence, if believed by the jury, would support a conviction under that statute, but not under section 246. Rosa De La Torre testified that a bullet entered her bedroom window, where her family was gathered eating pizza. It barely missed her, her boyfriend, and her daughter Angie before flying out the bathroom window. The police found eight bullet strike marks, four of which were on De La Torre's house: the front porch, the front door jamb, the center of the wall between De La Torre's bedroom and the door, and the one that went through her bedroom window and out the bathroom window. In addition, a bullet struck the side of another house on the property, in which De La Torre's grandmother resided. According to Detective Carey, all of the bullets that left strike marks were traveling south. Two vehicles and a camper shell on the property also showed strike marks. Accordingly, the evidence unequivocally established that, whatever the gunmen were aiming at, they in fact fired a *420 gun at two inhabited dwelling houses, thus violating section 246. Section 246's requirement that an inhabited dwelling house, etc. be within the gunmen's firing range was clearly established by the evidence. No reasonable jury could conclude that appellant violated section 246.3 but not section 246. He was guilty of both crimes if he was one of the gunmen or an aider and abettor, but if he was not, he was guilty of neither crime. No lesser included offense instruction was necessary.
Appellant argues the jury could find a violation of section 246.3, but not section 246 on the theory that the gunmen were shooting at Robert Rojas, not the buildings. As appellant recognizes elsewhere in his brief, however, this distinction was rejected in People v. Chavira (1970) 3 Cal. App.3d 988, 83 Cal.Rptr. 851: "Defendant and his associates, engaged in a fusillade of shots directed primarily at persons standing close to a dwelling. The jury was entitled to conclude that they were aware of the probability that some shots would hit the building and that they were consciously indifferent to that result." (Id. at p. 993, 83 Cal.Rptr. 851, fn. omitted.)
Appellant alternatively contends that his trial attorney rendered ineffective assistance by failing to request instruction upon a violation of section 246.3. A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, appellant would have obtained a more favorable result. (People v. Ledesma (1987) 43 Cal.3d 171, 216-218, 233 Cal.Rptr. 404, 729 P.2d 839.) Because the evidence did not support instruction upon section 246.3, counsel's failure to request such instruction could not have prejudiced appellant.

4. Section 654 does not preclude punishment on both counts 2 and 3.
The court sentenced appellant to consecutive life terms for attempted murder (count 2) and shooting at an inhabited dwelling (count 3). The court stated it found the offenses involved separate victims.
Appellant contends that the sentence on count 3 must be stayed under section 654 because counts 2 and 3 arose from a single, indivisible course of conduct and had the same objective: murdering Robert Rojas.
Section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. (People v. Latimer (1993) 5 Cal.4th 1203, 1208, 23 Cal.Rptr.2d 144, 858 P.2d 611.) If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. (Ibid.) However violent crimes against different victims may be separately punished. (People v. Miller (1977) 18 Cal.3d 873, 885, 135 Cal.Rptr. 654, 558 P.2d 552 overruled on another ground in People v. Oates (2004) 32 Cal.4th 1048, 12 Cal.Rptr.3d 325, 88 P.3d 56.)
Count 3 had several victims other than, or in addition to, Robert Rojas. Everyone inside the house was a victim with respect to count 3, while Robert Rojas was the sole victim for count 2. Accordingly, section 654 does not preclude separate punishment on counts 2 and 3.

5. Neither section 654 nor the merger doctrine bars enhancement of appellant's sentence under section 12022.53, subdivision (c).
Appellant contends that the imposition of a consecutive 20-year-to-life enhancement term under authority of section 12022.53, subdivision (c) on count 1 (murder) *421 violated section 654 and the merger doctrine of People v. Ireland (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (Ireland).
In Ireland, supra, 70 Cal.2d at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580, the court held the felony murder rule could not be applied when the only underlying felony committed by the defendant was assault. This principle has become known as the merger rule. The rationale for this rule is that permitting a felony murder conviction to be based upon assault would usurp most homicide law, relieve the prosecution in most homicide cases of needing to prove malice, and frustrate the Legislature's intent to punish deadly assaults committed with malice more harshly than other deadly assaults. (People v. Hansen (1994) 9 Cal.4th 300, 311-312, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
The rationale for the merger rule does not apply to section 12022.53, subdivision (c). That section provides, in pertinent part, that "[notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of ... 20 years." The felonies listed in section 12022.53, subdivision (a) include attempted murder. Section 12022.53, subdivision (c) thus reflects a legislative intent that murders committed by intentionally discharging a firearm generally be punished more harshly than other murders. Applying the merger rule in this context would frustrate the Legislature's intent. Accordingly, we decline to extend the merger rule to section 12022.53, subdivision (c). Division 5 of this court reached the same result with respect to an enhancement under section 12022.53, subdivision (d) in People v. Sanders (2003) 111 Cal.App.4th 1371, 4 Cal. Rptr.3d 676.
The Legislature may create an express exception to the application of section 654 by stating a specific legislative intent to impose additional punishment, e.g., that a defendant must receive a sentence enhancement in addition to any other authorized punishment. (People v. Ramirez (1995) 33 Cal.App.4th 559, 572-573, 39 Cal. Rptr.2d 374.)
In section 12022.53, the Legislature expressly created an exception to section 654. Subdivision (c) of section 12022.53 states that it applies "[n]otwithstanding any other provision of law." Subdivision (c) further provides that one to whom the enhancement applies "shall be punished by an additional and consecutive term of ... 20 years." This language clearly shows the Legislature did not intend the enhancement to be restricted by section 654's proscription against multiple punishment. (People v. Hutchins (2001) 90 Cal.App.4th 1308, 1313,109 Cal.Rptr.2d 643.)
Moreover, enhancement of appellant's sentence under section 12022.53 did not punish appellant twice for the same act. The term imposed for murder punishes appellant for killing Jesse Garcia. The enhancement, however, was punishment based upon the particular method appellant chose to take Garcia's life. Had appellant employed a different weapon, for example a knife, section 12022.53 would not have applied. Because the underlying crime and the enhancement are not identical, no double punishment occurred. (People v. Hutchins, supra, 90 Cal.App.4th at p. 1314,109 Cal.Rptr.2d 643.)
Appellant argues that People v. Seel (2004) 34 Cal.4th 535, 21 Cal.Rptr.3d 179, 100 P.3d 870 supports a contrary conclusion. However, the court in Seel concluded that the federal constitution's double jeopardy clause precluded retrial of a premeditation allegation after reversal for insufficiency of evidence. (Id. at p. 539, 21 *422 Cal.Rptr.3d 179, 100 P.3d 870.) Seel has no relevance to the applicability of section 654 to a section 12022.53 enhancement.

6. The trial court properly stayed the sentences on appellant's section 12022.53, subd. (b) enhancements.
With respect to counts 1 and 2, the jury made true findings on firearm-use enhancements under both subdivisions (b) and (c) of section 12022.53. The court imposed a 20-year enhancement under subdivision (c) on each of these counts, and stayed the subdivision (b) enhancements.
Appellant contends the trial court should have stricken, not stayed the enhancements under section 12022.53, subdivision (b).[4]
In People v. Bracamonte (2003) 106 Cal. App.4th 704, 131 Cal.Rptr.2d 334 (Bracamonte), Division Four of this district discussed the conflict between section 12022.53, subdivisions (f) and (h). Subdivision (f) states that only one enhancement may be imposed under section 12022.53, but subdivision (h) prohibits striking any enhancement imposed under section 12022.53. Harmonizing the two sections, Bracamonte held that each section 12022.53 enhancement found to be true should be imposed, but all except the enhancement carrying the greatest term of imprisonment should be stayed. (Bracamonte, supra, at p. 713, 131 Cal.Rptr.2d 334.)
We find the reasoning of Bracamonte persuasive and adopt it here. Accordingly, the trial court properly stayed the section 12022.53, subdivision (b) enhancements for counts 1 and 2.

DISPOSITION
The judgment is affirmed.
We concur: COOPER, P.J., and FLIER, J.
NOTES
[1] Appellant did not object to this argument and does not contend on appeal that it constituted misconduct.
[2] Unless otherwise noted, all statutory references are to the Penal Code.
[3] In pertinent part, CALJIC No. 9.03.3 provides as follows: "In order to prove this crime, each of the following elements must be proved: [¶] 1. A person willfully [and unlawfully] discharged a firearm; [¶] 2. The person who discharged the firearm did so in a grossly negligent manner; and [¶] 3. The discharge of the firearm was done in a manner which could result in injury or death to a person." Similarly, CALCRIM No. 970 provides, in pertinent part, that in order to convict a defendant of violating Penal Code section 246.3, the prosecution must prove "1. The defendant intentionally shot a firearm; [¶] 2. The defendant did the shooting with gross negligence; [AND] [¶] 3. The shooting could have resulted in the injury or death of a person."
[4] The same issue is pending in the California Supreme Court in several cases, including People v. Gonzalez, review granted Mar. 14, 2007, S149898, 56 Cal.Rptr.3d 470, 154 P.3d 997, which appellant cited in his opening brief.