Filed 10/10/14  P. v. Davis CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F066577 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BF141480A) |
| RICKY LADON DAVIS, JR., | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Kathleen M. Scheidel, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Kane, Acting P.J., Franson, J. and Peña, J.

# PROCEDURAL SUMMARY

Appellant, Ricky Ladon Davis, Jr., was charged in an information filed on July 30, 2012, with the first degree murder of Betty Jones (Pen. Code, § 187, subd. (a), count 1)[1] and the attempted murder of Kevin Toledano (§§ 664 & 187, subd. (a), count 2). Counts 1 and 2 alleged that Davis acted with premeditation and deliberation (§ 189) and personally used a firearm (§ 12022.5, subd. (a)). Count 1 alleged Davis committed great bodily injury (§ 12022.7) and personally discharged a firearm causing both great bodily injury and death to another (§ 12022.53, subd. (d)). Count 2 alleged Davis personally discharged a firearm (§ 12022.53, subd. (c)).

A jury trial began on November 5, 2012. Jury deliberations commenced on November 15, 2012, and were concluded the next day. Davis was found not guilty of first degree murder on count 1, but guilty of the lesser included offense of second degree murder.[2] The gun use enhancements alleged in count one were found to be true. Davis was acquitted of both attempted murder and attempted voluntary manslaughter in count 2.

On January 7, 2013, the trial court heard and denied Davis's motion for a new trial. The court sentenced Davis on that date to an indeterminate sentence of 15 years to life for second degree murder, plus a consecutive indeterminate sentence of 25 years to life for the section 12022.53, subdivision (d) enhancement. Davis's total sentence was 40 years to life. The court stayed Davis's sentence on the second gun use enhancement. The court imposed a $240 restitution fine and granted Davis 275 days of custody credits.

Appellate counsel has filed a brief seeking independent review of the case by this court pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).

---

[1] All further statutory references are to the Penal Code.

[2] The jury was instructed on the lesser included offense of voluntary manslaughter, but not on the lesser included offense of involuntary manslaughter.

## FACTS

Kevin Toledano and Beverly Watkins had lived together for many years. Their daughter, Katrina McDermott, was Davis's fiancée. McDermott had three children. Davis was the father of two of McDermott's children and she was pregnant with Davis's third child. Watkins's sister-in-law, Betty Jones, lived in an apartment with McDermott's parents. Jones was bedridden, could not walk, moved by wheelchair, and was on dialysis. Toledano had a problem with his back and used a cane. Jones called McDermott on April 8, 2012, Easter Sunday, about noon or 1:00 p.m. Jones told McDermott that Toledano and Watkins were arguing. McDermott could hear yelling and screaming over the telephone and Watkins asking Toledano to leave her alone. Jones reported that Toledano threw something at Watkins.

McDermott had talked to Davis about the difficulties between her parents, although he had not been present during a fight between McDermott's parents. McDermott told Davis that her mother had been hit by something thrown by McDermott's father. McDermott, Davis, and the children went to McDermott's parents' apartment to see if Watkins was alright. McDermott was not aware that Davis had any weapon.

When they arrived at McDermott's parents' apartment, Davis parked on the wrong side of the street closest to the door to the apartment. McDermott and Davis left the children in the car and knocked on the front door of the apartment. When McDermott and Davis entered the apartment, Toledano and Watkins were sitting down in the living room. They were no longer yelling and were not talking. Watkins did not appear to be injured and was not crying. Jones was in the bedroom in her bed.

Davis said to Toledano, "no disrespect to you" and asked Watkins how she was doing. When Davis asked Watkins if she was okay, she replied, "yeah." Davis again asked Watkins if she was okay and she said, "yes." Davis was not yelling.

3.

Toledano then got up. McDermott could tell her father was upset. McDermott could not remember exactly what Toledano said, but he started yelling and told Davis and McDermott to get out of his house. Toledano stood up and told Davis not to come into his house and disrespect him. Toledano stood up and walked past where Davis and McDermott were standing and then walked toward the kitchen. At that moment McDermott did not believe Davis had a weapon.

McDermott described the apartment as small. Toledano grabbed a knife with a black handle from the kitchen and came toward Davis and McDermott. Toledano held the knife vertically up in the air, positioned near his right ear, with the knife blade pointed at Davis and McDermott. McDermott was trying to push Davis out the door. Toledano is much bigger than Davis.[3] Toledano is over six feet tall; Davis is five feet six inches tall.

Watkins stepped in between Toledano, McDermott, and Davis. Davis said something like he would be back and then left. At this time no one had been injured. Davis walked back to the car and drove away before returning about 10 minutes later with the children and a man named Myron Allen. When Davis returned, McDermott, Watkins, and Jones were outside of the apartment. Toledano was still inside the apartment.

Davis exited the car. Allen drove the car down the street to a cul-de-sac, with the children inside. Toledano came outside. Allen remembered seeing McDermott and Jones outside the apartment. Jones was in her wheelchair. Allen heard Davis say to McDermott, "Tell him to get the knife now." Allen thought Davis was referring to Toledano. Allen did not see anything in Davis's hands.

---

[3]     McDermott testified that Davis had never been violent toward her or anyone else and had a reputation for being nonviolent.

4.

McDermott asked Davis to leave. Toledano came outside and was yelling. McDermott knew Toledano was upset. McDermott could not remember if her father had anything in his hands. McDermott began pushing Davis back with her pregnant belly toward the car to prevent further conflict between Davis and Toledano. McDermott could not remember whether Davis got back into the car. McDermott then noticed that Davis pulled out a gun from a pocket. McDermott thought she heard the gun click.

Toledano and Davis were arguing and yelling back and forth at each other. McDermott had her back toward Toledano. McDermott was trying to get Davis into the car and leave. McDermott remembered Davis reaching around her with one of his arms with the gun in his hand. McDermott heard the gun go off and saw gun powder from the gun. The gun was not in her hand or Allen's hand; it was in Davis's hand. Davis got into the car and remained there until an officer yelled at him to get out of the car. Davis complied and lay on the ground; he was then detained.

Deputy James York of the Marin County Sheriff's Department lived in Bakersfield near the site of the shooting. York heard a heated argument and saw a female pushing Davis backward. York heard Davis say things like, "I'm a real nigger" and "I'll fuck you up." York was getting into his car with his kids but then told them they would leave later and to go back inside their home. Davis then yelled something to the effect, "I'll kill you. I'll shoot you. I'll kill you."

York sent his children into their home. York saw Davis pull a gray metallic gun from either the right side of his waist or right pocket. Davis leaned around McDermott, cocked his head down, and fired a round. York pushed his children to the ground, withdrew his own sidearm, pulled his badge off with his left hand, stood up, and approached Davis shouting, "Police. Put it down. Freeze." York also told Davis, "Deputy sheriff, freeze, you're under arrest. Let me see your hands." "I'll kill you if you come out with a gun."

5.

Davis looked at York, turned around, and got into the rear passenger seat of the car. When the vehicle moved forward three to five feet, York gave the driver commands to stop. York told the driver to shut off the engine and to put his hands up to the roof where York could see them. York aimed his gun at Davis and told Davis to open the door and to come out. The first thing Davis said was "Don't shoot me. I don't want to die." York had Davis lie on the ground and ordered the driver to get out of the car and to sit on the curb. The gun was recovered inside the car. There was one spent cartridge and two live rounds in the gun.

Jones was in her wheelchair about 20 feet away from where Toledano had been standing when Davis fired the shot. After other law enforcement officers arrived, York walked over to Jones. Jones had a single puncture wound to her left upper torso. York put a finger over the wound and determined there was no suction. There was a small amount of blood from the wound.

The parties stipulated that Jones was the victim identified in count 1 of the information; Jones was treated at Kern Medical Center on April 8, 2012, for a gunshot wound and then transported to the University of Southern California Medical Center for treatment of her gunshot wound; and Jones died on April 13, 2012, at 11:36 p.m. while being treated for her gunshot wound. The parties further stipulated that Jones's body was transported back to Kern County where an autopsy was performed on April 19, 2012, by Dr. Robert Whitmore; Whitmore described the path of the bullet through Jones's body; the bullet was recovered from Jones's body; and Whitmore determined the cause of Jones's death to be from complications of the gunshot wound to the chest and the manner of death to be homicide.

After the shooting, investigators recorded a statement given by Toledano that was played for the jury. Toledano testified that he lied during most of the recorded statement. Toledano asserted in the recorded statement that Davis came to the apartment threatening him and acting as though he (Davis) had something in his pocket. Davis had pulled a gun

on Toledano once before. When Davis refused to leave, Toledano pulled out a knife but McDermott pushed Davis out the door before Toledano could go toward Davis.

When Davis returned, Toledano could hear others trying to stop him from coming inside the apartment. Toledano went outside. Toledano saw Davis raise a gun to shoot him and heard a click but the gun did not fire. Toledano said Davis started talking shit. Toledano challenged Davis, asking him why he always had to get a gun. Davis picked up the gun again and this time it fired. Although Davis aimed the gun directly at Toledano, and Toledano believed Davis was trying to kill him, Davis's hand moved slightly and the bullet hit Jones. At trial, Toledano denied Davis had pulled a gun on him in the past.

Davis testified in his defense. On April 8, 2012, Davis went to church with his family. He had a vision of his mother in a casket and started crying. When they returned home, McDermott received a phone call from Jones about her parents that caused her to cry. The family went to McDermott's parents' apartment. There, Toledano cussed, screamed, pushed Davis, grabbed a knife, and threatened to kill Davis. Toledano is much bigger than Davis, who is only five feet four inches tall and weighs only 130 pounds.

Davis left the apartment, picked up Allen, and then went to his own house where he retrieved a revolver from the closet. The gun was not loaded with ammunition. Davis had three bullets and loaded them into the gun. Davis said that when he returned to McDermott's parents' apartment 10 to 15 minutes later, Toledano started cursing and coming toward Davis. Watkins tried to push Toledano back into the apartment but he kept coming toward Davis. Toledano made additional threats at Davis. Davis was afraid of him.

As Toledano approached him, Davis initially brandished the gun. Toledano continued to advance toward Davis and was mouthing off. Davis was backing up toward the car. Davis remembered pulling out the gun from his pocket and lifting it. He did not remember firing the gun but, when he lifted it, the gun went off. Davis did not intend to kill Toledano or Jones and denied pulling the trigger. Davis was impeached with his

7.

statement to investigators, which was recorded and played for the jury. Davis said that once Toledano pushed him, he was not going to back down. Davis did not tell investigators that Toledano threatened to kill him.

Davis told investigators that he heard the gun click the first time he pulled it out and knew it was an empty chamber. Davis said he was angry at Toledano but was not planning to kill him. Davis just wanted to hit Toledano in the leg, or something.

## APPELLATE COURT REVIEW

Davis's appointed appellate counsel has filed an opening brief that summarizes the pertinent facts, raises no issues, and requests this court to review the record independently. (*Wende*, *supra*, 25 Cal.3d 436.) Although counsel filed a *Wende* brief, counsel states in the brief that Davis wants this court to address whether the trial court erred in failing to instruct the jury on involuntary manslaughter and whether the trial court erred in instructing the jury on second degree felony murder based on the predicate offense of discharging a firearm in a grossly negligent manner.

The *Wende* brief also includes the declaration of appellate counsel indicating that Davis was advised he could file his own brief with this court. By letter on June 4, 2013, we invited Davis to submit additional briefing. Davis replied with a letter brief filed with this court on August 7, 2013.

Elaborating on the points made by appellate counsel in the *Wende* brief, Davis argues that because he was acquitted of the attempted murder and attempted voluntary manslaughter of Toledano, the verdicts are inconsistent. Davis believes the inconsistent verdicts indicate that the jury necessarily found no malice and he was, therefore, entitled to an involuntary murder instruction. Davis also argues his acquittal of attempted murder and attempted voluntary manslaughter of Toledano precluded his conviction for second degree murder. Davis argues that the merger doctrine analyzed by the California

8.

Supreme Court in its *Ireland*[4] case precludes his conviction for second degree murder because his underlying felony of using a gun merged into the killing itself. Finally, Davis argues that there was insufficient evidence that the victim died of a gunshot wound.

Examining Davis's last two points first, we note that the parties stipulated as established fact that the victim, Jones, was shot in the chest and died of a gunshot wound after being treated in hospitals in Bakersfield and Los Angeles. It was stipulated that the coroner determined Jones died from this gunshot wound and her manner of death was homicide.[5] The cause of Jones's death was factually uncontested.

Davis's merger doctrine argument is not entirely clear. Davis appears to be arguing that he was convicted on a theory of felony murder and the underlying felony, his use of a gun, merged into the crime of second degree murder as established in *Ireland*.[6]

There are two problems with Davis's merger doctrine argument. First, the prosecution's theory at trial was not based on felony murder, but on the transferred intent doctrine.[7] Davis's target during the shooting was Toledano, but he shot Jones instead. The felony murder doctrine has no factual or legal application to this case. Second, Davis was convicted of an enhancement for personal use of a gun in the commission of second degree murder. Davis's conviction for the gun enhancement was not an

---

**4**     *People v. Ireland* (1969) 70 Cal.2d 522 (*Ireland*); see *People v. Chun* (2009) 45 Cal.4th 1172, 1200 (*Chun*).

**5**     On August 27, 2014, this court denied Davis's request that we take judicial notice of Jones's medical records, which Davis contends show Jones had other serious medical infirmities that could have caused her death. These medical records do not appear to have been part of the original record.

**6**     In the *Wende* brief, appellate counsel expresses this issue as whether the trial court erred in instructing the jury on second degree felony murder based on the predicate offense of discharging a firearm in a grossly negligent manner.

**7**     The jury was instructed on the transferred intent doctrine with CALCRIM No. 562. The prosecutor argued that the transferred intent doctrine applied to this case.

underlying felony used to support his second degree murder conviction based on the felony murder doctrine. Rather, it was a separate enhancement that when found true by the jury increased his sentence for personally using a gun.

Davis's remaining contentions are related to his belief that he was entitled to an involuntary murder instruction. Davis emphasizes what he views as inconsistent verdicts by the jury—finding him guilty of the second degree murder of Jones, but acquitting him of the attempted murder and attempted voluntary manslaughter of Toledano. Davis believes the acquittals show the jury found no malice. We disagree.

Inconsistent verdicts are allowed to stand. (*People v. Avila* (2006) 38 Cal.4th 491, 600; *People v. Guerra* (2009) 176 Cal.App.4th 933, 943-944.) We generally refuse to invalidate an inconsistent verdict if it is otherwise supported by substantial evidence. Inconsistent findings by a jury frequently result from leniency, mercy, or confusion. (*People v. York* (1992) 11 Cal.App.4th 1506, 1510-1511.) Assuming arguendo that the jury verdicts in counts 1 and 2 were inconsistent, we draw no inferences from the inconsistency, including Davis's inferences that the jury expressly or impliedly found no malice and no conscious disregard for life.

We further reject Davis's argument that his acquittal on count 2 precluded his conviction of count 1 for second degree murder. First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. Malice may be expressed (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life). Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation, which elevate the killing to first degree murder. (*Chun, supra,* 45 Cal.4th at p. 1181; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).

"To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation." (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.) "If the provocation would not cause an average person to

experience deadly passion but it precludes the defendant from subjectively deliberating and premeditating, the crime is second degree murder." (*Ibid.*) If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101, 108 (*Lasko*); *Hernandez*, at p. 1332.)

Manslaughter is the unlawful killing of a human being without malice. (§ 192; *Lasko*, *supra*, 23 Cal.4th at p. 108.) A defendant lacks malice and is guilty of voluntary manslaughter in limited and explicitly defined circumstances that occur either when the defendant acts in a sudden quarrel or heat of passion or when the defendant kills in unreasonable self-defense. (*Lasko*, at p. 108.)

Related to Davis's argument that the acquittal on count 2 precluded a conviction for second degree murder is his argument that he was entitled to jury instructions on involuntary manslaughter. In *People v. Blakeley* (2000) 23 Cal.4th 82, 88-89, 91 (*Blakeley*), our Supreme Court held "that a defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter." The crime committed is not involuntary manslaughter. (*Ibid.*) Our Supreme Court reiterated its holding in *Blakeley* that voluntary manslaughter, but no lesser offense, is committed when one kills unlawfully, and with a conscious disregard for life, but lacks malice because of provocation or imperfect self-defense. (*People v. Rios* (2000) 23 Cal.4th 450, 461, fn. 7.)

Involuntary manslaughter is defined as the killing of a human being in the commission of an unlawful act, not amounting to a felony, or, in the commission of a lawful act that might produce death, in an unlawful manner, or without due caution and circumspection. (§ 192, subd. (b); *People v. Prettyman* (1996) 14 Cal.4th 248, 274; see *People v. Lewis* (2001) 25 Cal.4th 610, 645 (*Lewis*).)

We find no evidence in this record to support Davis's contention that his conduct constituted involuntary manslaughter. Under *Blakeley* and the evidence supporting his

defense, Davis was certainly entitled to voluntary manslaughter instructions, and he received these. He also received, inter alia, instructions on justifiable homicide for self-defense or defense of another, excusable homicide for accident, the definition of malice, and provocation.

The jury found Davis guilty of the greater offense of second degree murder.[8] In doing so, the jury necessarily found malice. The jury heard mitigating testimony and was instructed on imperfect self-defense, heat of passion, and provocation. The jury returned a verdict not of voluntary manslaughter, but of second degree murder. There was substantial evidence of malice in this record. After independent review of the record, we have concluded there are no reasonably arguable legal or factual issues.

## DISPOSITION

The judgment is affirmed.

---

[8] Because the jury rejected voluntary manslaughter under the facts of this case, we believe it would be difficult, if not impossible, for Davis to show prejudice for the absence of involuntary murder instructions. (See *Lewis*, *supra*, 25 Cal.4th at p. 646.)